**SCHNADER HARRISON SEGAL & LEWIS LLP**
**A Pennsylvania Limited Liability Partnership**
**LISA J. RODRIGUEZ**
**New Jersey Managing Partner**
**Woodland Falls Corporate Park**
**220 Lake Drive East, Suite 200**
**Cherry Hill, New Jersey  08002-1165**
**Phone: (856) 482-5222 ▪ Fax: (856) 482-6980**
*Attorneys for Plaintiff*

**Additional Counsel Listed on Signature Page**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LARRY A. COLTRANE, Derivatively and on Behalf of SYNCHRONOSS TECHNOLOGIES, INC.,<br><br>              Plaintiff,<br>   v.<br><br>STEPHEN G. WALDIS, WILLIAM J. CADOGAN, THOMAS J. HOPKINS, JAMES M. MCCORMICK, DONNIE M. MOORE, KAREN L. ROSENBERGER, RONALD W. HOVSEPIAN, and JOHN FREDERICK,<br><br>            Defendants,<br><br>         and<br><br>SYNCHRONOSS TECHNOLOGIES, INC.,<br><br>          Nominal Defendant. | Civil Action No._____<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT BREACHES OF FIDUCIARY DUTY, WASTE, AND VIOLATIONS OF § 14 OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Larry A. Coltrane ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of

fiduciary duties, waste, and violations of Section 14(a) of the Securities Exchange Act of 1934.

## NATURE OF THE ACTION

1.     Synchronoss offers mobility solutions for service providers and enterprises via software and various platforms.  The services provided by the Company aid in the creation and management of online mobile customer and employee experiences.

2.     As detailed herein, this action arises from wide array of wrongdoing by the Individual Defendants (defined herein), including a scheme during 2016 to pump up the Company's stock price by divesting components of its business to an undisclosed related entity controlled by the friends and family of the Company's Executive Chairman and Chief Executive Officer ("CEO"), defendant Stephen G. Waldis ("Waldis").  In furtherance of this scheme, the Individual Defendants misrepresented the financial terms of the divestiture and the financial strength of the Company's cloud computing segment.

3.     While Synchronoss stock was artificially inflated by the Individual Defendants' concealment of material information, they sold hundreds of thousands of shares of Company stock for proceeds of over $22 million, and authorized the repurchase of over $100 million in Company stock at the artificially inflated prices.

4.     In December 2016, the Individual Defendants caused the Company to announce that it was acquiring a cloud-computing content manager and service provider, Intralinks Holdings, Inc. ("Intralinks") for $13.00 per share, and divesting 70% of Synchronoss's carrier activation business to Sequential Technology International, LLC ("Sequential") for $146 million. The complete terms of the Sequential transaction and that Sequential was actually controlled by friends and family of defendant Waldis were not disclosed to investors.  As part of the Intralinks transaction, defendant Ronald W. Hovsepian ("Hovsepian"), the CEO of Intralinks, was

appointed CEO of Synchronoss.

5.     The truth was first revealed to the Company's stockholders on February 24, 2017, when the Southern Investigative Reporting Foundation ("SIRF") published an reporting that the Individual Defendants had concealed key aspects of the Intralinks and Sequential deals from investors.  In particular, the SIRF article for the first time alerted investors that Sequential was merely the alias for an entity called Omniglobe USA ("Omniglobe").  Omniglobe is a business process outsourcer that has extensive ties to the Company and its senior executives and is 50% owned by "friends and family of Synchronoss."

6.     Although the SIRF report revealed some of the Individual Defendants' deception, they nevertheless continued to untruthfully portray the Company's business.  On February 27, 2017, the Individual Defendants caused the Company to disclose that they had entered a $9.2 million licensing agreement between Synchronoss and Sequential, with the $9.2 million amount being recorded as revenue and conveniently allowing the Company to meet its revenue and earnings targets.  In reality, this licensing agreement was a sham designed to allow the Company to meet guidance previously issued by the Individual Defendants.

7.     On April 27, 2017, the Company disclosed that defendant Hovsepian was departing after only a few months as CEO to "to pursue other interests," and defendant Waldis would become CEO again.  The Company's Chief Financial Officer ("CFO"), defendant John Frederick ("Frederick") was also departing after only a few months "to pursue other interests." The Individual Defendants paid both Hovsepian and Frederick millions in severance compensation even though they were apparently being fired.  At the same time, the Individual Defendants disclosed that the Company would be unable to meet first quarter 2017 guidance.

8.     On May 15, 2017, when the Individual Defendants caused the Company to issue a

press release stating that Synchronoss would be unable to file its Form 10-Q for the first quarter of 2017 due to an accounting inquiry.

9.     On June 13, 2017, the Individual Defendants caused the Company to disclose that Synchronoss would be required to restate its previously issued financial statements for the quarters and years of 2015 and 2016.

10.     The Company's board is currently comprised of five directors.   Prior to commencing this action, plaintiff made no demand for action on the Board because doing so would have been a futile act.  All five of the Company's directors sold millions of dollars' worth of Company stock at artificially inflated levels, voted to approve the Sequential transaction which they then misrepresented to investors, voted to cause the share repurchase program even though they knew material negative information was being concealed from the public, and voted to confer on defendants Hovsepian and Frederick millions of dollars in severance even though they were being terminated for their role in the wrongdoing.  Accordingly, all five directors currently on the Synchronoss Board would be interested in an investigation of their insider sales, and took numerous Board actions that appear to be the product of bad faith and therefore do not receive the deferential business judgment review.  As a result, demand is excused.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Plaintiff is a citizen of Hawaii and no defendant is a citizen of that state.

12.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities

Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Synchronoss is headquartered in this District, and defendants have received substantial compensation by engaging in activities that had an effect in this district and are directly related to the wrongdoing alleged herein.

**PARTIES**

**A.     Plaintiff**

14.     Plaintiff is a current stockholder of Synchronoss common stock, and has continuously held Synchronoss common stock at all times relevant hereto.  Plaintiff is a citizen of Hawaii.

**B.     Defendants**

15.     Nominal defendant Synchronoss is an entity incorporated under the laws of the State of Delaware maintaining its principal executive offices at 200 Crossing Boulevard, Bridgewater, New Jersey 08807.  Synchronoss stock trades on the NASDAQ under the ticker symbol "SNCR."

16.     Defendant Waldis co-founded the Company and has served as Executive Chairman since January 2017, and was the Chairman of the Board since 2001 and CEO from 2000 until January 2017.  Waldis was appointed CEO again in April 2017.  At relevant times, Waldis was a member of the Board's Business Development Committee.  During 2016, Waldis received compensation from the Company of $5,707,946.  During the wrongdoing described herein, defendant Waldis sold at least 329,769 shares of Company stock at artificially inflated

prices for proceeds of over $10.5 million.  Upon information and belief, Waldis is a citizen of New Jersey.

17.     Defendant William J. Cadogan ("Cadogan") has served as a director of the Company since 2005.   At relevant times, Cadogan was the Chair of the Compensation Committee, and a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Business Development Committee.   During 2016, Cadogan received $283,194 from the Company in director fees.  During the wrongdoing described herein, Cadogan sold at least 62,500 shares of Company stock at artificially inflated prices for proceeds of over $1.9 million.  Upon information and belief, Cadogan is a citizen of Florida.

18.     Defendant Thomas J. Hopkins ("Hopkins") has served as a director of the Company since 2004.  Hopkins is a member of the Audit Committee and the Compensation Committee and the Chair of the Business Development Committee.   During 2016, Hopkins received director fees of $275,694 from the Company.  During the wrongdoing described herein, Hopkins sold at least 52,500 shares of Company stock at artificially inflated prices for proceeds of over $2 million.  Upon information and belief, Hopkins is a citizen of New Jersey.

19.     Defendant James M. McCormick ("McCormick") is a co-founder of the Company and has served as a director since 2000.   McCormick is the Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.   During 2016, McCormick received director fees of $248,194 from the Company.   During the wrongdoing described herein, McCormick sold at least 52,500 shares of Company stock at artificially inflated prices for proceeds of over $1.9 million.  Upon information and belief, McCormick is a citizen of New Jersey.

20.     Defendant Donnie M. Moore ("Moore") has served as a director of the Company

since 2007.  Moore is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  During 2016 Moore received director fees of $273,194 from the Company.  During the wrongdoing described herein, Moore sold at least 32,500 shares of Company stock at artificially inflated prices for proceeds of over $1.3 million.  Upon information and belief, Moore is a citizen of Florida.

21.    Defendant Karen L. Rosenberger ("Rosenberger") served as the Company's Executive Vice President and CFO from April 2014 until February 27, 2017.  During 2016, Rosenberger received compensation from the Company of $1,720,909, and in 2015, she received $1,871,183.  In connection with her resignation, Rosenberger was given approximately $1.9 million in severance and related benefits.  During the wrongdoing described herein, Rosenberger sold at least 33,142 shares of Company stock at artificially inflated prices for proceeds of over $1.2 million.  Upon information and belief, Rosenberger is a citizen of Virginia.

22.    Defendant Hovsepian served as the Company's CEO and a director for approximately four months, from January 19, 2017 until his resignation on April 27, 2017.  From December 2011 until its sale to Synchronoss in January 2017, Hovsepian was President and CEO, and a director of Intralinks.  In connection with his resignation, Hovsepian was provided severance benefits of approximately $3.2 million in cash and the vesting of over 18,000 shares of Company stock, as well as a consulting agreement entitling him to $750,000 per year for two years.  Upon information and belief, Hovsepian is a citizen of Massachusetts.

23.    Defendant Frederick served as the Company's CFO from February 27, 2017 until he resigned on April 27, 2017 "to pursue other interests."  When Frederick resigned, he was provided severance of $1.2 million cash.  Upon information and belief, Frederick is a citizen of Florida.

24.     The defendants named in ¶¶ 16-23 are the "Individual Defendants."

## DEFENDANTS' DUTIES

25.     By reason of their positions as officers, directors, and/or fiduciaries of Synchronoss and because of their ability to control the business and corporate affairs of Synchronoss, at all relevant times defendants owed Synchronoss and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Synchronoss in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of Synchronoss and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Synchronoss and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     Defendants, because of their positions of control and authority as directors and/or officers of Synchronoss, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the defendants had knowledge of material non-public information regarding the Company.

27.     To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

     a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

8

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.      Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

d.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

28.     On October 28, 2015, the Individual Defendants caused the Company to issue a press release announcing financial results for the third quarter of 2015.  In the press release, Waldis was quoted stating that Synchronoss has "significantly expanded [its] addressable market with the launch of [its] enterprise business and the Synchronoss Secure Mobility Suite" and that the adoption of the Company's "cloud and activation platforms continues to grow globally." Rosenberger was quoted as stating that "strategic customer relationships, combined with our growth investments and expansion into new market opportunities, position us well to scale Synchronoss to the next level and generate greater shareholder value over time."

29.     On November 5, 2015, the Individual Defendants caused Synchronoss to file its Form 10-Q for the third quarter of 2015.  The Form 10-Q was signed by Waldis and Rosenberger and confirmed the financial results announced in the October 28, 2015 press release.

30.     On February 3, 2016, the Individual Defendants caused Synchronoss to issue a press release announcing financial results for fourth quarter and full year 2015.  The press release reported $157.8 million in revenue for the fourth quarter, up 21% year-over-year, fourth quarter earnings per share of $0.61, up 16% year-over-year, and fourth quarter Cloud Services revenue

at $90.9 million, up 43% year-over-year.  The press release quoted Waldis as stating that the "Cloud Services business continues to perform, well, driven by increasing subscriber adoption across our expanding customer base."  Rosenberger was quoted stating that the Company's investments during 2015 positioned Synchronoss "to generate significant value for our shareholders."

31.     On February 4, 2016, the Individual Defendants caused the Company to issue a press release announcing that the Board had approved a $100 million share repurchase program made possible due to the Company's supposedly "very strong market position and financial profile, in addition to a large and expanding addressable market opportunity."  The press release, quoted Waldis as stating: "[w]e expect to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow.  In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon that we believe will enhance our long-term growth and profitability profile."

32.     On February 26, 2016, the Individual Defendants caused Synchronoss to file its Form 10-K for the 2015 fiscal year.  The Form 10-K was signed by defendants Waldis, Rosenberger, Cadogan, Hopkins, McCormick, and Moore and reaffirmed the representations made in the February 3 and 4 press releases.

33.     Between March 1, 2016 and June 30, 2016, the Individual Defendants caused Synchronoss to repurchase over $40 million of its own common stock at artificially inflated prices that averaged approximately $32.00 per share.

34.     On April 7, 2016, defendants Waldis, Hopkins, Cadogan, McCormick, and Moore issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held May 17, 2016.  In the proxy statement, these five Individual

Defendants solicited stockholder votes in favor of three management proposals to: (i) to elect McCormick and Moore to new terms as directors; (ii) ratification of appointment of Ernst & Young LLP as the Company's independent auditor; and (iii) approve the Company's executive compensation in an advisory vote.

35.     The proxy statement stated that "[a]n overall review and assessment of risk is inherent in [the] Board's consideration of our business plans, strategies, and other significant developments.   Additionally, our Board regularly reviews various risks arising out of transactions and other matters that are presented to our Board and when making decisions impacting us. At least annually, our Board also reviews and analyzes the strategic and operational risks and opportunities that face our Company as a whole, as well as those related to specific areas of our business."  The proxy statement disclosed the following in connection with the responsibilities of the Audit Committee:

> Our Audit Committee is responsible for overseeing our Board's execution of its risk management oversight responsibility, including discussing guidelines and policies governing the process by which our management and other persons responsible for risk management assess and manage our exposure to major financial risk exposures and the steps management has taken to monitor and control such exposures, based on consultation with our management and independent.

36.     According to the proxy statement, defendants Waldis and Rosenberger were compensated $6.8 million and $1.8 million, respectively during 2015 based on their supposed performance.

37.     The 2016 proxy statement was materially misleading for the following reasons: (i) it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; (ii) it failed to disclose that the Company's public filings improperly recognized revenues and bonuses; (iii)

the Company's internal controls were inadequate; and (iii) as a result, the Company's financial statements were inaccurate and misleading.  A reasonable stockholder would have found the truth to be material when deciding whether to vote for or against these proposals.

38.     On May 5, 2016, the Individual Defendants caused the Company to issue a press release announcing the Company's "Strong First Quarter [2016] Results," and stating: "[c]loud services were robust this quarter, as increasing subscriber growth on our core customer base is laying the groundwork for incremental cloud opportunities both domestically and internationally over the next 12 to 18 months."

39.     On May 10, 2016, the Individual Defendants caused the Company to file with the Securities and Exchange Commission ("SEC") its Form 10-Q for the first quarter of 2016.  The Form 10-Q was signed by defendants Waldis and Rosenberger and reaffirmed the supposedly "strong financial results" announced in the Company's press release issued on May 5, 2016.

40.     On May 20, 2016, the Individual Defendants caused the Company to file with the SEC a Form 8-K disclosing the result of the stockholder vote solicited in the misleading proxy statement described above.  On the basis of the Individual Defendants' misrepresentations, defendants McCormick and Moore were reelected to new terms as directors, the Company's independent auditor was ratified, and the advisory vote on executive compensation was approved.

41.     On August 3, 2016, the Individual Defendants caused the Company to issue a press release announcing "Strong Second Quarter [2016] Results" and stating "Cloud was strong this quarter, as solid subscriber growth in our core customer base is setting the stage for incremental cloud opportunities while investments in the enterprise initiatives are already generating significant customer activity in the field."

42.     On August 4, 2016, the Individual Defendants caused the Company to file with the SEC its Form 10-Q for the second quarter of 2016.   The Form 10-Q was signed by defendants Waldis and Rosenberger reaffirmed the financial results announced in the August 3 press release.

43.     On November 7, 2016, the Individual Defendants caused the Company to issue a press release announcing "Strong Third Quarter [2016] results and stating that "Cloud was very strong this quarter with both new and existing customers, as solid subscriber growth and expanded cloud initiatives in our core customer base set the stage for the next chapter of growth at Synchronoss."

44.     Also on November 7, 2016, the Individual Defendants caused the Company to conduct an earnings call to discuss the third quarter 2016 results.   During the call, the Individual Defendants announced that they would "evaluate strategic alternatives" for Synchronoss' s activation business in an effort to enhance stockholder value.   During the call, defendant Waldis stated:

> Yes, we're obviously in the process of evaluating opportunities in the activation world.   Clearly, there are good pockets of strength, certainly in analytics, certainly in some of the new emerging areas, Internet of Things.   But there has been obviously areas or facets that have slowed down as you guys have seen in the market today. And so, when you look and compare that to both our cloud and enterprise business that have both high growth trajectories and margin profile significantly better than the activation business, we want to make sure that as we evaluate the process that we're doing everything we can to ensure we're making the investments in the high-growth, high margin businesses of the future.   And that's something that will play out over the next quarter or so, and as we'd mentioned we'll certainly keep everybody up to speed.

45.     On November 8, 2016, the Individual Defendants caused the Company to file with the SEC a Form 10-Q for the third quarter of 2016.   The Form 10-Q was signed by

defendants Waldis and Rosenberger and reaffirmed the results announced in the November 7 press release.

46.    On December 6, 2016, the Individual Defendants caused the Company to issue a press release disclosing the agreement to acquire Intralinks for approximately $821 million and that Hovsepian, who was CEO of Intralinks, would be appointed CEO of Synchronoss and join the Board.  The press release depicted Intralinks as a very successful company and stated:

> In Intralinks' 20-year history, over 4.1 million business users across the world have used its secure, cloud-based platform, and it counts 99% of Fortune 1000 companies among its customers.  To date, Intralinks has supported over $31 trillion in high-stakes transactions, making the company a leader in the enterprise content collaboration market.
>
> "Intralinks has established itself as a household name in the financial services world over the past 20 years, with a keen focus on growing its presence into the next generation secure content collaboration market over the coming years," said Stephen Waldis, Synchronoss' CEO.  "This acquisition marks another major step in the transformation of Synchronoss to significantly expand the scale and scope of the company's enterprise initiatives and strong carrier relationships in attacking this multi-billion dollar market opportunity. [...]."
>
> *   *   *
>
> "Our board of directors unanimously concluded that Synchronoss is the ideal strategic partner for Intralinks and also gives our employees and customers the opportunity to leverage Synchronoss' deep relationships across the carrier space, cloud expertise, and strong partnerships in the financial services vertical," said Ron Hovsepian, CEO of Intralinks.  "Together with Synchronoss, we believe we can deploy enhanced enterprise and mobile solutions to our customers while opening up new enterprise distribution channels across the world."

47.    The December 6 press release also disclosed that the Company would sell 70% of its activation business to Sequential for approximately $146 million, and that, pursuant to the terms of the transaction, the remaining 30% ownership interest in the activation business retained

by Synchronoss could be reduced during 2017.

48.     In light of the Intralinks and Sequential transactions, the press release provided "initial 2017 revenue guidance of between $810 million and $820 million with pro forma EPS of between $2.45 and $2.60 for the combined entity" and stated that the Company was "targeting $40 million of combined synergies within the first year of closing the Intralinks deal."

49.     On January 5, 2017, the Individual Defendants caused the Company to file with the SEC a Form 8-K that disclosed for the first time certain terms of the Sequential transaction. In particular, the transaction would initially net the Company only $17.3 million in cash and included an $83 million note receivable.

50.     In a separate Form 8-K filed with the SEC the same day, the Individual Defendants caused the Company to disclose that the transaction was structured as a joint venture in which Synchronoss contributed components of its carrier-activation business and had a 30% ownership stake.  Sequential, which owned the remaining 70% of the joint venture, would finance "the purchase of these assets through cash, a new term loan, and a sellers note issued by Synchronoss."   Further, the Company entered into a transition services agreement with Sequential in order to support indirect activities stemming from the joint venture, and the Company would receive an annual payment of approximately $32 million pursuant to the terms of the agreement.

51.     On February 8, 2017, the Individual Defendants caused the Company to issue a press release announcing financial results for the fourth quarter and full year 2016.  The press release reported revenue of $147.8 million and earnings per share of $0.24 for the quarter and quoted defendant Hovsepian as stating: "Synchronoss has transformed its strategy with the Intralinks acquisition and divestiture of its traditional activation business as the company now

looks to expand the scale and scope of its enterprise and cloud initiatives to drive the new SNCR 3.0 vision." The press release quoted defendant Waldis as staying that: "[i]t has been an exciting time at Synchronoss over the past few months as we view the acquisition of Intralinks to be a major step forward in our enterprise strategy with [Hovsepian] leading the team to successfully integrate both companies into a single portfolio."

52. On the same day, the Individual Defendants caused the Company to conduct a conference call to discuss the fourth quarter and full year 2016 results. During the call, Rosenberger stated that accounting for the Intralinks transaction, "2017 non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined Company. On a normalized basis when adjusting for divestitures and the Intralinks acquisition, this would imply year-over-year growth of between 13% and 15%." Rosenberger also provided first quarter 2017 guidance of "total revenues of between $173 million and $178 million," and "non-GAAP gross margins of between 70% and 71% for the full year 2017."

53. During the call, defendants were asked about the terms of the Sequential transaction:

> [Tavis C. McCourt]
>
> > Okay. And then, just some details on the Sequential sale. So, can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period and maybe the margins on those revenues and kind of the timing of when you would expect them to go away?
>
> [Defendant Rosenberger]
>
> > Yeah. So, I can give you some information on that, Tavis. I think as we went through the transaction, we talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technology and, obviously, contractual around $30

million in revenue per year over the next three years associated
with those services.  As far as margins, et cetera, we don't give
those details, but it's clearly consistent with our mix of business.

\* \* \*

[Tom Roderick]

Got it.  I think I got it.  And then this may be related to your
commentary on the ongoing piece, but just so I understand what
that piece is.  Because I know you were sort of highlighting - you
guys were highlighting in the calculation around the financing
documents that service agreement, which probably is what you're
referring to with Sequential.  But can you talk a little bit more
about what that agreement is?  How you're still supporting them as
a partner?  And will all of that revenue then flow into continuing
ops going forward?  Or is that $32 million annual agreement, is
that all just thrown into discontinuing ops, so we won't have to
worry about it?

[Defendant Rosenberger]

Actually, that will be part of continuing operations.  And if you
want to think about the services that we provide for Sequential,
remember the fact that we had software revenues associated with
some of that activation business in that analytics area.  And that
particular IP was obviously kept by Synchronoss and Synchronoss
will be providing services around that.

\* \* \*

[Samad Samana]

Hi.  I actually wanted to follow-up on the $32 million payment.  I'm curious, so
when you gave the original $520 million of cloud revenue guidance for calendar
2017, did that assume the $32 million services agreement or how much of this
analytics revenue that's now being put into cloud was previously in activation?  I
guess, I'm just trying to bridge, the math of guidance didn't change, but there is
this $32 million payment now that you're getting.  Help me understand where that
was classified before or where you thought that would be classified into?

[Defendant Rosenberger]

No, this is new analytics revenue as we talked about.  Clearly, the
$32 million is part of a TSA arrangement, but it is all around the
analytics.

## THE TRUTH BEGINS TO EMERGE

54.     On February 24, 2017, the SIRF published its article titled "Synchronoss Technologies: The Friends and Family Plan," which reported that the Individual Defendants were concealing material information regarding the Intralinks and Sequential transactions. According to the article, Sequential was simply an alias for Omniglobe, business process outsourcing firm.  Synchronoss first disclosed related party transactions with Omniglobe in 2006 when current and former executives and directors of Synchronoss, including Waldis, held ownership stakes in Omniglobe.  The SIRF article quoted Jaswinder Matharu, who, according to the article, owns 50% of Omniglobe, as stating that half of Omniglobe is currently "owned by friends and family of Synchronoss."  These apparent conflicts of interest had been concealed by the Individual Defendants.  The SIRF article stated in part:

> The Sequential Technology International portrayed in the company's conference calls and press releases sounds like a standard corporate buyer, chosen after some consideration among a number of different options.

> That's not remotely the case.

> To start, the Southern Investigative Reporting Foundation could not locate STI in any corporate registry or database— it's a corporate shell, formed in early November, 2016 whose website was registered by John Methfessel, a former neighbor of Stephen Waldis and an early-stage Synchronoss investor.

> * * *

> So what is Omniglobe International?

> It's a business process outsourcing company (often abbreviated to "BPO") that handles non-essential tasks for Synchronoss' Activation unit.  Specifically, through offices in the Philippines and India, Omniglobe provides phone activation customer service for Synchronoss' AT&T contract.

In its June 2006 initial public offering prospectus, Synchronoss disclosed that Omniglobe was a related party, a legal term of art that in this case means that four of its officers had an investment in Omniglobe, and would benefit financially from doing business with it.  (As detailed on page 74 of the prospectus, then-CEO Waldis had a 12.23 percent ''indirect equity interest in Omniglobe,'' former chief financial officer Lawrence Irving and former chief technology officer David Berry both had 2.58 percent and current president and chief operating officer Robert Garcia had 1.29 percent.)

55.     On February 27, 2017, the Individual Defendants caused the Company to file with the SEC its 10-K for 2016.  The Form 10-K was signed by defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore.  The Form 10-K reaffirmed the financial results in the February 8, 2017 press release and for the first time revealed that on December 22, 2016, the Individual Defendants had caused Synchronoss to "enter[] into a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software."  The software license was concealed during the February 8, 2017 earnings call even though the Individual Defendants fielded numerous questions about payments from Sequential to the Company.

56.     The $9.2 million licensing fee, paid just before the close of 2016, materially improved the Company's 2016 Cloud segment revenue and profit margin, and also represented the majority of the Company's fourth quarter 2016 profits and earnings per share.

57.     On April 6, 2017, defendants Waldis, Hopkins, Cadogan, McCormick, Moore, and Hovsepian issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held May 16, 2016.  In the proxy statement, these six Individual Defendants solicited stockholder votes in favor of four management proposals to: (i) to elect Hopkins to a new term as a director; (ii) ratify the appointment of Ernst & Young LLP as

the Company's independent auditor; (iii) approve the Company's executive compensation in an advisory vote; and (iv) set the frequency of future advisory votes on executive compensation.

58.     The proxy statement stated that "[a]n overall review and assessment of risk is inherent in [the] Board's consideration of our business plans, strategies, and other significant developments.   Additionally, our Board regularly reviews various risks arising out of transactions and other matters that are presented to our Board and when making decisions impacting us. At least annually, our Board also reviews and analyzes the strategic and operational risks and opportunities that face our Company as a whole, as well as those related to specific areas of our business."  The proxy statement disclosed the following in connection with the responsibilities of the Audit Committee:

> Our Audit Committee is responsible for overseeing our Board's execution of its risk management oversight responsibility, including discussing guidelines and policies governing the process by which our management and other persons responsible for risk management assess and manage our exposure to major financial risk exposures and the steps management has taken to monitor and control such exposures, based on consultation with our management and independent.

59.     According to the proxy statement, defendants Waldis and Rosenberger were compensated $5.7 million and $1.7 million, respectively during 2016 based on their supposed performance.

60.     Notably, the section of the proxy statement describing related party transactions did not disclose that the Sequential transaction was a related party transaction.

61.     The 2017 proxy statement was materially misleading for the following reasons: (i) it concealed a major related party transaction; (ii) it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; (ii) it failed to disclose that the Company's public filings

improperly recognized revenues and bonuses; (iii) the Company's internal controls were inadequate; and (iii) as a result, the Company's financial statements were inaccurate and misleading.  A reasonable stockholder would have found the truth to be material when deciding whether to vote for or against these proposals.

62.     On April 27, 2017, the Individual Defendants caused the Company to issue a press release announcing that defendant Hovsepian was departing as CEO "to pursue other interests," with Waldis returning to his previous role as CEO, and defendant Frederick, the CFO, was also departing to pursue "to pursue other interests."  In the press release, the Individual Defendants disclosed that Synchronoss "expects total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance.  Operating margins are expected to be 8% to 10%, which are less than previously announced guidance." Defendant Waldis was quoted stating that the Individual Defendants were "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks."

63.     On May 12, 2017 the Individual Defendants caused the Company to file with the SEC a notification of its inability to timely file the first quarter 2017 Form 10-Q.

64.     On May 15, 2017, the Individual Defendants caused the Company to issue a press release stating that the Company's inability to timely file the first quarter Form 10-Q was due to the need review accounting for certain transactions in prior financial periods.

65.     On May 22, 2017, the Individual Defendants caused the Company to file with the SEC a Form 8-K disclosing the results of the stockholder vote solicited in the 2017 proxy statement.  On the basis of the Individual Defendants' misrepresentations in the proxy statement, defendant Hopkins was reelected to a new term as director, the Company's independent auditor

was ratified, the advisory vote on executive compensation was passed, and the frequency of advisory of vote on executive compensation was set at one year, also in an advisory vote.

66.   On June 13, 2017, the Individual Defendants caused the Company to file with the SEC a Form 8-K disclosing that: "the Company's previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective quarterly periods . . . should be restated and should no longer be relied upon."  The restatement was required because:

> [C]ertain errors have been identified in the Relevant Periods concerning revenue recognition in connection with certain licensing transactions.  The Company has determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting.... In connection with the impact of the . . . errors, the Company also concluded that certain related expenses recognized in the Relevant Periods will be reversed.
>
> The Company has concluded to restate its financial statements for the Relevant Periods to correct the above identified accounting errors and certain other immaterial prior period errors.  The Company does not expect the corrections to have an impact on total cash flows for the Relevant Periods, to result in any customer refunds or to impact the Company's services to its customer.
>
> \*   \*   \*
>
> The Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016.  It is possible the Company may identify additional material weaknesses.

### THE INDIVIDUAL DEFENDANTS' STOCK SALES

67.   While they were aware of undisclosed material information as detailed above, the Individual Defendants hundreds of thousands of shares of Synchronoss stock for over $22 million in ill-gotten gains:

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
| --- | --- | --- | --- | --- |

| Waldis: | 2/21/2017 | 11,852 | $32.6600 | $387,086.32 |
|---|---|---|---|---|
| | 2/14/2017 | 13,853 | $33.7100 | $466,984.63 |
| | 2/3/2017 | 8,265 | $39.0000 | $322,335.00 |
| | 10/5/2016 | 13,000 | $40.8500 | $531,050.00 |
| | 9/14/2016 | 13,000 | $40.4300 | $525,590.00 |
| | 8/24/2016 | 13,000 | $40.6100 | $527,930.00 |
| | 7/6/2016 | 13,000 | $32.3200 | $420,160.00 |
| | 6/8/2016 | 13,000 | $36.1200 | $469,560.00 |
| | 5/18/2016 | 13,000 | $34.8300 | $452,790.00 |
| | 4/13/2016 | 13,000 | $32.4900 | $422,370.00 |
| | 3/23/2016 | 23,000 | $30.2800 | $696,440.00 |
| | 3/16/2016 | 45,721 | $30.0200 | $1,372,544.42 |
| | 3/3/2016 | 200 | $30.0100 | $6,002.00 |
| | 3/2/2016 | 8,509 | $30.0000 | $255,270.00 |
| | 2/18/2016 | 4,143 | $25.4000 | $105,232.20 |
| | 2/16/2016 | 21,869 | $23.1300 | $505,829.97 |
| | 2/3/2016 | 6,927 | $27.9100 | $193,332.57 |
| | 1/14/2016 | 24,430 | $31.1300 | $760,505.90 |
| | 1/13/2016 | 70,000 | $30.6800 | $2,147,600.00 |
| | **TOTAL** | **329,769** | **$32.0500** | **$10,568,613.01** |
| | | | | |
| Cadogan: (Director) | 1/4/2017 | 7,500 | $39.3900 | $295,425.00 |
| | 12/30/2016 | 20,000 | $38.5600 | $771,200.00 |
| | 2/9/2016 | 25,000 | $22.9600 | $574,000.00 |
| | 1/5/2016 | 10,000 | $33.9400 | $339,400.00 |
| | **TOTAL** | **62,500** | **$31.6800** | **$1,980,025.00** |
| | | | | |
| Hopkins : (Director) | 12/15/2016 | 27,500 | $41.6500 | $1,145,375.00 |
| | 11/12/2015 | 25,000 | $36.9000 | $922,500.00 |
| | **TOTAL** | **52,500** | **$39.3900** | **$2,067,875.00** |
| | | | | |
| McCormick: (Director) | 8/4/2016 | 27,500 | $40.0000 | $1,100,000.00 |
| | 12/23/2015 | 25,000 | $35.8600 | $896,500.00 |
| | **TOTAL** | **52,500** | **$38.0300** | **$1,996,500.00** |
| | | | | |
| Moore: | 1/12/2017 | 5,500 | $38.1900 | $210,045.00 |
| | 12/13/2016 | 5,500 | $41.1500 | $226,325.00 |

| (Director) | 11/14/2016 | 5,500 | $47.9300 | $263,615.00 |
| | 10/12/2016 | 5,500 | $39.3800 | $216,590.00 |
| | 9/12/2016 | 5,500 | $40.6300 | $223,465.00 |
| | 12/23/2015 | 5,000 | $35.8900 | $179,450.00 |
| | **TOTAL** | **32,500** | **$40.6000** | **$1,319,490.00** |
| | | | | |
| **Rosenberger:** | 2/21/2017 | 3,183 | $32.6400 | $103,893.12 |
| **(Executive Vice** | 2/14/2017 | 516 | $33.7300 | $17,404.68 |
| **President, CFO,** | 2/8/2017 | 2,000 | $36.9300 | $73,860.00 |
| **and Treasurer)** | 2/3/2017 | 2,162 | $39.0000 | $84,318.00 |
| | 1/23/2017 | 777 | $39.0800 | $30,365.16 |
| | 1/11/2017 | 3,000 | $38.0700 | $114,210.00 |
| | 1/4/2017 | 815 | $38.8400 | $31,654.60 |
| | 12/28/2016 | 4,000 | $39.6300 | $158,520.00 |
| | 12/27/2016 | 10,000 | $39.5100 | $395,100.00 |
| | 11/21/2016 | 83 | $48.9200 | $4,060.36 |
| | 10/3/2016 | 755 | $40.8600 | $30,849.30 |
| | 8/22/2016 | 83 | $40.7700 | $3,383.91 |
| | 7/6/2016 | 787 | $31.4500 | $24,751.15 |
| | 5/24/2016 | 83 | $35.3000 | $2,929.90 |
| | 4/4/2016 | 753 | $32.1200 | $24,186.36 |
| | 2/24/2016 | 70 | $25.0100 | $1,750.70 |
| | 2/18/2016 | 899 | $25.4300 | $22,861.57 |
| | 2/16/2016 | 810 | $23.1300 | $18,735.30 |
| | 2/3/2016 | 1,466 | $27.9100 | $40,916.06 |
| | 1/5/2016 | 831 | $33.6600 | $27,971.46 |
| | 11/24/2015 | 69 | $38.3300 | $2,644.77 |
| | **TOTAL** | **33,142** | **$36.6400** | **$1,214,366.40** |
| | | | | |
| **TOTAL INSIDER SALES** | | **652,474** | **$33.9000** | **$22,116,638.67** |

### DAMAGES TO SYNCHRONOSS

68.     As a direct and proximate result of the Individual Defendants' conduct, Synchronoss has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

      a.     Legal fees incurred in connection with the currently pending securities

class action arising out the related events;

b.    Any funds paid to settle the securities class action;

c.    Costs incurred investigating the restatement;

d.    The overpayment by approximately $26 million for artificially inflated Synchronoss stock during the stock repurchase program;

e.    Funds lost due to unfavorable related party agreements that were not negotiated at arms'-length;

f.    Compensation paid to defendants who were breaching their fiduciary duties;

g.    Incentive compensation paid on the basis of artificially inflated results;

h.    Severance and other benefits of over $7.9 million paid to defendants Hovsepian, Rosenberger, and Frederick; and

i.    Costs incurred due the improper insider sale of over $22 million Company stock.

69.    In addition, Synchronoss' s business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

70.    The actions complained of herein have irreparably damaged Synchronoss' s corporate image and goodwill.  For at least the foreseeable future, Synchronoss will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Synchronoss' s ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff brings this action derivatively in the right and for the benefit of Synchronoss to redress injuries suffered, and to be suffered, by Synchronoss as a direct result of breaches of fiduciary duty by the Individual Defendants.  Synchronoss is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

72.     Plaintiff will adequately and fairly represent the interests of Synchronoss in enforcing and prosecuting its rights.

73.     Plaintiff has continuously been a stockholder of Synchronoss at times relevant to the wrongdoing complained of and is a current Synchronoss stockholder.

74.     When this action was filed, Synchronoss' s Board consisted of defendants Waldis, Cadogan, Hopkins, McCormick, and Moore.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below

**Defendant Waldis**

75.     Defendant Waldis was well aware that the Company's public disclosures were materially misleading and inaccurate as detailed above.  Waldis is currently the Company's CEO and Chairman of the Board.  In addition to having personally issued many of the misleading statements and public filings described above, as a co-founder and longtime CEO, Waldis was responsible for supervising the Company's risk management, and as CEO he was ultimately responsible for the Company's conduct.  Accordingly, Waldis is substantially likely to be held liable for breaching his fiduciary duties to Synchronoss.

76.     Defendant Waldis was compensated by the Company $6.8 million in 2015 and $5.7 million in during 2016.  As a founder and longtime CEO of Synchronoss, his personal reputation and access to continued millions in compensation as Company CEO would be at risk if he were to pursue claims against his fellow directors in response to a stockholder demand. Accordingly, Waldis could not independently and disinterestedly evaluate a demand for action against himself or his fellow directors, and demand is excused on that basis as well.

77.     Defendant Waldis obtained over $10 million in proceeds from stock sales conducted while he know material non-public information, and he knew that information had not been disclosed.  Defendant Waldis would be interested in demand requiring him to investigate his own personal knowledge and state of mind when he made those stock sales, and he would be interested in a demand to claw back proceeds or incentive compensation earned while he was committing breaches of fiduciary duties.  As a result, demand is excused as to Waldis.

**Defendant Cadogan**

78.     Defendant Cadogan was a member of the Audit Committee while the Company was issuing misleading and inaccurate financial disclosures and other public statements.  While he was breaching his fiduciary duties in this manner, he executed sales of Company stock that provided him with proceeds of over $1.9 million.  Defendant Cadogan would be interested in demand requiring him to investigate his own personal knowledge and state of mind when he made those stock sales, and he would be interested in a demand to claw back proceeds or incentive compensation earned while he was committing breaches of fiduciary duties.  As a result, demand is excused as to Cadogan.

**Defendant Hopkins**

79.     Defendant Hopkins was a member of the Audit Committee while the Company

27

was issuing misleading and inaccurate financial disclosures and other public statements. While he was breaching his fiduciary duties in this manner, he executed sales of Company stock that provided him with proceeds of over $2.0 million. Defendant Hopkins would be interested in demand requiring him to investigate his own personal knowledge and state of mind when he made those stock sales, and he would be interested in a demand to claw back proceeds or incentive compensation earned while he was committing breaches of fiduciary duties. As a result, demand is excused as to Hopkins.

**Defendant Moore**

80.     Defendant Moore was the Chair of the Audit Committee while the Company was issuing misleading and inaccurate financial disclosures and other public statements. While he was breaching his fiduciary duties in this manner, he executed sales of Company stock that provided him with proceeds of over $1.3 million. Defendant Moore would be interested in demand requiring him to investigate his own personal knowledge and state of mind when he made those stock sales, and he would be interested in a demand to claw back proceeds or incentive compensation earned while he was committing breaches of fiduciary duties. As a result, demand is excused as to Moore.

**Defendant McCormick**

81.     Defendant McCormick was a director while the Company was issuing misleading and inaccurate financial disclosures and other public statements. While he was breaching his fiduciary duties in this manner, he executed sales of Company stock that provided him with proceeds of over $1.9 million. Defendant McCormick would be interested in demand requiring him to investigate his own personal knowledge and state of mind when he made those stock sales, and he would be interested in a demand to claw back proceeds or incentive compensation

earned while he was committing breaches of fiduciary duties.  As a result, demand is excused as to McCormick.

**Audit Committee Members Cadogan, Hopkins and Moore**

82.     Defendants Cadogan, Hopkins, and Moore were members of the Audit Committee during the wrongdoing detailed herein.  The Audit Committee members were responsible for oversight of risk related to the Company's financial disclosures and for review of related party transactions.  However, defendants Cadogan, Hopkins, and Moore declined to require the Company to fully disclose all material information regarding, among other things, the terms of the Sequential transaction, permitted inaccurate disclosures regarding the Company's financial results, and did not disclose that the Sequential transaction was a related party transaction, even though the Audit Committee is expressly charged with oversight of related party transactions.  Moreover, while these material facts were being concealed, each of Cadogan, Hopkins, an Moore conducted extensive sales of their Synchronoss holdings at artificially inflated prices as detailed above.  As a result, demand is excused as to Cadogan, Hopkins, and Moore.

**Compensation Committee Members Cadogan, Hopkins, and McCormick**

83.     According to the Company's proxy statements, Compensation Committee members Cadogan, Hopkins, and McCormick awarded incentive compensation to defendants Waldis and Rosenberger during 2015 and 2016, while Waldis and Rosenberger were breaching their fiduciary duties.  Specifically, Cadogan, Hopkins, and McCormick awarded Waldis over $5 million in incentive compensation in 2016, and over $6.2 million in 2015, and they awarded Rosenberger over $1.3 million in incentive compensation in 2016, and over $1.4 million in 2015.  Additionally,  Cadogan, Hopkins, and McCormick awarded Hovsepian over $3.2 million in severance benefits for his three months of service as Synchronoss' s CEO, and they awarded

defendant Frederick $1.2 million in cash severance for his two months of service as CFO. Cadogan, Hopkins, and McCormick therefore awarded millions of dollars in compensation to officers who were breaching their fiduciary duties.  Either these three defendants knew that they were awarding compensation officers who were engaged in wrongdoing or they intentionally failed to inform themselves prior to taking action.  In either event, they would be interested in a demand regarding their award of this compensation, and demand is excused as to them.

**The Entire Board**

84.     Defendants Waldis, Cadogan, Hopkins, McCormick, and Moore approved the Sequential transaction and had a duty to inform themselves before doing so.  Assuming that they conducted the process required under Delaware law to inform themselves prior to approving the transaction, they knew that Sequential was the alias for Omniglobe, a related party.  However, they permitted this fact to be concealed in the Company's public filings and statements related to the transaction, and they concealed this fact in the 2017 proxy statement.  Their entrance into such a transaction and concealment thereof placed the interests of other insiders over the interests of Synchronoss's stockholders.  As a result, defendants Waldis, Cadogan, Hopkins, McCormick, and Moore face a substantial likelihood of liability for breaching their fiduciary duties, including the duty of loyalty, and demand is excused as to them.

85.     Plaintiff has not made any demand on the other stockholders of Synchronoss to institute this action since such demand would be a futile and useless act for at least the following reasons:

a.     Synchronoss is a publicly held company with millions of shares outstanding and thousands of stockholders;

b.      making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

c.      making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I
## Breach of Fiduciary Duty

86.      Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.      Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Synchronoss's business and affairs, particularly with respect to issues as fundamental as disclosures of related party transactions, proper accounting practices, and candid disclosures in public filings.

88.      Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Synchronoss.

89.      In breach of their fiduciary duties owed to Synchronoss, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

90.      In particular, the Individual Defendants knowingly or recklessly permitted the Company to issue pervasively misleading and inaccurate public disclosures.

91.      The Individual Defendants, as directors of the Company, owed Synchronoss the highest duty of loyalty.  The Individual Defendants knowingly or recklessly breached their duty of loyalty by: (i) granting incentive compensation and providing severance pay to officers who

were involved in the wrongful conduct, even though they knew of the wrongdoing and the harm to the Company; and (ii) enriching themselves through improper insider stock sales while they were withholding material information from the Company's public stockholders.

92.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, Synchronoss has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<strong><u>COUNT II</u><br><u>Violations of Section 14 of the Securities Exchange Act of 1934</u></strong>

93.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  Specifically, the Company's proxy statements filed April 7, 2016 and April 6, 2017 violated §14(a) and Rule 14a-9 because they omitted material information and failed to disclose that: (i) incentive compensation was paid to named executive officers who were breaching their fiduciary duties to the Company; (ii) the Board was not discharging its risk oversight process as described in the proxy statements; and (iii) the Sequential transaction was a related party transaction.

95.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

96.     The misrepresentations and omissions in the proxy statement were material to Company stockholders in voting on the proxy statement.  Each of the 2016 and 2017 proxy

statements solicited stockholder votes for director nominees and advisory votes on executive compensation.  The proxy statements were an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

97.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statements.

## COUNT III
## Waste

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.    As a result of the misconduct described above, the defendants Waldis, Cadogan, Hopkins, McCormick, and Moore caused Synchronoss to exchange corporate assets for consideration so disproportionately small as to be beyond the range at which any reasonable person would be willing to trade.  The severance packages provided to Hovsepian and Frederick when they were effectively being fired and had served at the Company for less than four months were effectively gifts to them.

100.    Defendants Waldis, Cadogan, Hopkins, McCormick, and Moore did not inform themselves as to the options to avoid this expenditure, such as a termination with cause.  Their failure to do so was not in good faith, and no substantial consideration was received by the Company.

101.    As a result of the waste of corporate assets, Waldis, Cadogan, Hopkins, McCormick, and Moore are liable to the Company.

102.    Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, plaintiff demands judgment on behalf of Synchronoss as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Synchronoss and

that plaintiff is an adequate representative of the Company;

B.      Against all defendants, jointly and severally and in favor of Synchronoss for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty and waste;

C.      Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Synchronoss;

D.      Directing the defendants to take all necessary actions to reform and improve Synchronoss's corporate governance and internal procedures to comply with applicable laws and to protect Synchronoss and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.      a proposal to strengthen the Company's disclosure and financial controls;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a provision to permit the stockholder of Synchronoss to nominate at least three candidates for election to the Board; and

4.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to Synchronoss exemplary damages, including disgorgement of all profits, benefits, and other compensation obtained by defendants, in an amount necessary to punish defendants and to make an example of defendants to the community

according to proof at trial;

  F. Awarding Synchronoss restitution from defendants, and each of them;

  G. Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

  H. Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

  Pursuant to Fed. R. Civ. P. 38(b), plaintiff a trial by jury.


Dated: October 30, 2017

        s/ *Lisa J. Rodriguez*
        Lisa J. Rodriguez
        SCHNADER HARRISON SEGAL & LEWIS LLP
        220 Lake Drive East, Suite 200
        Cherry Hill, New Jersey 08002
        Telephone: (856) 482-5222
        Facsimile: (856) 482-2578
        lrodriguez@schnader.com

        HARWOOD FEFFER LLP
        Robert I. Harwood
        Matthew M. Houston
        Benjamin I. Sachs-Michaels
        488 Madison Avenue, 8th Floor
        New York, New York 10001
        Telephone: (212) 935-7400
        Facsimile: (212) 753-3630
        rharwood@hfesq.com
        mhouston@hfesq.com
        bsachsmichaels@hfesq.com

        GLANCY PRONGAY & MURRAY, LLP
        Robert V. Prongay
        Lesley F. Portnoy
        1925 Century Park East, Suite 2100
        Los Angeles, California 90067
        Telephone: (310) 201-9150

Facsimile: (310) 201-9160
rprongay@glancylaw.com
lportnoy@glancylaw.com

*Attorneys for Plaintiff*

**SYNCHRONOSS TECHNOLOGIES, INC. VERIFICATION**

I, Larry A. Coltrane, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.


Date: 10/26/2017
_____

DocuSigned by:

_Mr. Coltrane_
5439BAED9A0A4C9
_____

Larry A. Coltrane